## *In re* CORNING *et al.*

### UNITED STATES *v.* GREENHUT *et al.*

*(District Court, N. D. Ohio, E. D.*  June 11, 1892.)

1. MONOPOLIES—CRIMINAL LAW—INDICTMENT.

An indictment under the act of July 2, 1890, relating to monopolies, averred that defendants, in pursuance of a combination to restrain trade in distillery products between the states and monopolize the traffic therein, acquired by lease or purchase, prior to the passage of the act, some 70 distilleries, producing three quarters of the distillery products of the United States, and that they continued to operate the same after the passage of the law, and by certain described means sold the product at increased prices. *Held,* that no crime was charged in respect to the purchase or continued operation of the distilleries, since there was no averment that defendants obligated the vendors of the distilleries not to build others, or to withhold their capital or experience from the business.[1]

2. SAME.

The indictment further averred that defendants, in pursuance of the combination, shipped certain of the products to Massachusetts, and sold them there through their distributing agents to dealers, who were promised a rebate of five cents per gallon on their purchases, provided such dealers purchased their distillery products exclusively from the distributing agents, and sold them no lower than the prescribed list prices, said rebate to be paid when such dealers should sign a certificate that they had so purchased and sold for six months; and that by this means defendants had controlled and increased the price of distillery products in Massachusetts. *Held,* that no crime was charged with respect to such sales, since there was no averment of any contract whereby the purchasers bound themselves not to purchase from others, or not to sell at less than list prices.

3. CRIMINAL LAW—FEDERAL COURTS—REMOVAL OF PRISONER.

On an application to a federal court for the removal of a resident of the district to a distant state and district for trial, it is the duty of the court to scrutinize the indictment, disregarding technical defects, but to refuse the warrant if the crime alleged is not triable in the district to which a removal is sought, or if the indictment fails to charge any offense under the law.

At Law.  Indictment against Joseph B. Greenhut and others for violating the law against monopolies.  Heard on application for a warrant to remove defendants to another district for trial.  Denied and prisoners discharged.

*Allen T. Brinsmade,* Dist. Atty., for the United States.

*Elihu Root, Thos. Thatcher,* and *S. E. Williamson,* for defendants.

RICKS, District Judge.  This cause comes before me upon the application by the district attorney for a warrant for removal to the district of Massachusetts of Warren Corning and Julius French, citizens of this judicial district, against whom is pending an indictment preferred by the United States in the district court for the district of Massachusetts.  A certified copy of the indictment, together with the return of A. J. Williams, a United States commissioner for the circuit court of this district, that said defendants refused to give bail, and were by him committed, is filed.  The defendants object to the granting of a warrant for removal, because the indictment does not charge an offense against the laws of the United States.  Being residents and citizens of this judicial district, they

---

[1] See U. S. v. Greenhut, 50 Fed. Rep. 469, for a decision in the district court of Massachusetts on motion to quash.

claim the right, upon this application, to challenge the sufficiency of the indictment, and insist that it is the duty of the district judge, before ordering the removal of a citizen to a distant district for trial, to scrutinize the indictment, and to refuse the warrant in case it appears upon the face of the indictment either that the crime alleged was not committed in the district to which the removal is asked, or that the indictment does not sufficiently charge an offense under the law, or for other material defects in that instrument, or in the act upon which it is founded. The order of removal is not a mere ministerial act on the part of the district judge, but is a judicial function, including the exercise of a legal discretion upon the papers presented in support of the application. I fully concur in the opinion of Judges DILLON and TREAT in *Re Buell*, 3 Dill. 116. In that case, on the proposition that the question of the sufficiency of the indictment was for the court in which it was found, and not for the district judge on an application for the warrant of removal, Judge DILLON said:

"I cannot agree to the proposition in the breadth claimed for it in the present case. The provision devolves on a high judicial officer of the government a useful and important duty. In a country of such vast extent as ours, it is not a light matter to arrest a supposed offender, and, on the mere order of an inferior magistrate, remove him hundreds, it may be thousands, of miles for trial. The law wisely provides the previous sanction of the district judge to such removal. Mere technical defects in an indictment should not be regarded; but a district judge who should order the removal of a prisoner when the only probable cause relied on or shown was an indictment, and that indictment failed to show an offense against the United States, * * * would misconceive his duty, and fail to protect the liberty of the citizen."

Ordinarily, where an offense charged was committed in the district where one or more of the several defendants reside, the trial of the accused should be had in the district of which he is or they are inhabitants. Where an offense has been committed in several different districts, and the accused reside in other and different districts, the government has a right to elect in which one of the districts the prosecution may be conducted; and, under proper conditions, may elect to prosecute them in a district other than that in which they or either of them reside. There may be exceptional conditions which would justify prosecution in a district remote from that in which any one of a number of defendants resides, or far remote from the district where the principal business of the accused is conducted. But the spirit of our laws is to indict and try offenses in the district where the defendants reside, if the offense was committed in such district, and if local influences and prejudices are not too serious obstacles to be overcome.

I am moved to these remarks because it appears in this case that, if the indictment sufficiently charges an offense in the district of Massachusetts, a similar offense was committed in almost every other district of the United States, and more flagrantly in the district in which some of the accused reside, and in one of which several of them reside and conduct their principal business. It appears from the indictment that one of the defendants resides in the southern district of New York, where

many transactions similar to those averred in the indictment take place; several reside in the southern district of Ohio; several reside in this district; and several reside in the northern district of Illinois, where the corporation was organized and has its legal residence, and conducts its principal business. In each of these four districts similar offenses were committed.

These are not stated as reasons why they should not be removed for trial, if, in fact, a sufficient indictment is pending against them in the district of Massachusetts, but rather as justifying a closer scrutiny into the indictment than if the only offenses committed were those alleged in this indictment, or the district of Massachusetts was the only place where the strong arm of the law could reach them. Does the indictment charge an offense under the act of July 2, 1890, known as "An act to protect trade and commerce against unlawful restraints and monopolies?" The first section of the act declares illegal "every combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several states, or with foreign nations." The second section declares that "every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a misdemeanor."

The indictment alleges that before the enactment of the law in question the defendants, for the purpose of monopolizing and restraining the trade and commerce in distillery products among the several states of the nation, combined with others, and purchased or leased or otherwise obtained control of 70 distilleries, which had theretofore been competing, separate distilleries, and so operated them as to produce 77,000,-000 gallons of distillery product, which output comprised about 75-100 of the total production of the distilleries of the United States; and that the condition of trade in such products during the period charged was such that the defendants, by means of their combination, were able to prevent free competition on the actual price of such products, and thereby control the price, so as to augment and increase the price thereof to consumers in the district of Massachusetts, and to restrain trade therein among the several states.

The first count of the indictment alleges a combination on the part of the defendants to restrain the trade and commerce in the district of Massachusetts, and between that state and other states of the Union, in distillery products, of which it charges that defendants produced 75-100 of the entire production of the United States, and avers that on October 3, 1890, they sold to Mills & Gaffield, in Boston, 5,642.82 gallons of alcohol, said alcohol being part of the product of said distilleries, and made in Peoria, Ill., and intended to be transported and sold to said Mills & Gaffield in Boston; and with the intent to restrain the trade therein they fixed the price at which said Mills & Gaffield should sell the same in the district of Massachusetts, or for transportation to the other states, and did compel said Mills & Gaffield to sell said alcohol at no less price than that fixed by the defendants; and, by reason of their com-

bination, said defendants did control the amount of said products sold in said district or for transportation to other states, and did counteract the effect of free competition on the usual price at which said products were sold in Massachusetts or for transportation to other states, and did increase and augment the price at which said products were sold in said state, and for transportation to other states, and did thereby exact and procure great sums of money from the citizens of said district, and thereby, and by other means to the jurors unknown, restrain the trade and commerce in said products, between the state of Massachusetts and other states of the Union.

The second count charges the defendants with combining and monopolizing to themselves the trade and commerce in distillery products. It charges, in the same terms set forth in the first count, the purchase and lease of 70 distilleries, controlling 75-100 of the distillery products of the United States, which distilleries had been before that time competing producers; and with the same purpose, to monopolize the trade in said products, they made 75-100 of the entire output of the distilleries of the several states; and with the intent of controlling the trade and price of said products in said state of Massachusetts, and between the several states, and of monopolizing the trade in said state and between said states, did, on the 18th day of September, 1890, sell to C. I. Hood & Co., of Lowell, in said state, through Webb & Harrison, as distributing agents for defendants, 526.52 proof gallons of alcohol, and with intent to monopolize said trade did then and thereby promise said Hood that if, for a certain time agreed upon, said Hood should purchase exclusively from the defendants his supplies of such goods as defendants were then making, and during that period should not sell such goods at any lower prices than the list of the defendants' distributing agents, and should subscribe to a certificate that he had purchased all such supplies from defendants, and had not sold the same at prices lower than their distributing agents had sold the same, then defendants would return to said Hood five cents per proof gallon on the goods so purchased by Hood. On September 23, 1891, Kelly & Durkee having purchased from said Webb & Harrison, as distributing agents of defendants, 85.54 proof gallons of alcohol, said defendants, with intent to, and in pursuance of said attempt to monopolize the trade, etc., did at Boston, on said date, promise Kelly & Durkee that, if for the period agreed on they purchased exclusively of one or more certain dealers named, their supplies of goods then made by defendants, said dealers being then distributing agents for defendants, and should not sell such goods at any lower prices than such dealers' list prices, which said defendants controlled and fixed, and should certify that they purchased all their distillery products for said period from some one of the dealers so named by defendants, and had not sold any goods so purchased at any lower prices than said dealers' list prices, with freight (if any) paid, then said defendants would repay to said Kelly & Durkee five cents for each proof gallon purchased; and that defendants, in pursuance of said combination, did make other promises to Hood, to the

same effect, and also to Kelly & Durkee, and did thereby, in the way charged, attempt to monopolize the trade in said products in said district, and between the several states of the Union.

The third count charges a combination in restraint of trade, alleging a transaction with Hood on October 2, 1891, involving purchases by him of 518.81 gallons of distillery products, under circumstances substantially the same as averred in the preceding counts; alleging that defendants promised Hood, six months from the date of said purchases, a rebate of five cents per gallon, upon conditions similar to those averred in the second count, and averring divers other similar contracts with Hood in the said district.

And the fourth count avers that on the 7th day of May, 1892, said defendants entered into a certain contract in restraint of trade and commerce in distillery products among the several states, and especially in restraint of trade and commerce in Massachusetts and other states, with Kelly & Durkee, which contract was, in substance, that, for the purpose of securing the continuous patronage of the purchaser, the defendants, six months after date, promised to repay to Kelly & Durkee five cents per proof gallon of defendants' products then purchased, upon condition that said purchasers or their successors, from date of voucher or purchase to time of payment, shall buy exclusively such kind of goods as are produced by defendants from some one of their agents designated, and shall not sell the same at prices lower than said dealers' list prices, and shall certify to that effect, said defendants acting in the name of the Distillery & Cattle Feeding Company, being from the 22d of September, 1891, up to the finding of the indictment, manufacturers of said distillery products within certain states of the United States other than Massachusetts, and the kind of goods referred to in said contract being distillery products, said Kelly & Durkee having on the said 7th day of May complied with all the conditions of said contract. The first, third, and fourth counts are based on the first section of the act, and charge a combination and conspiracy in restraint of trade, while the second count charges a combination to monopolize a part of the trade in distillery produces between the states.

Now, giving to this indictment the broadest possible construction; giving to the facts therein set forth and to the acts committed the meaning most favorable to the prosecution,—what is the offense charged? It is that the defendants, prior to the act of July 2, 1890, by lease or purchase, acquired some 70 distilleries throughout the several states of the Union, and from them produced 77,000,000 gallons of distillery products, which then constituted 75-100 of the entire distillery products of the United States, and that they continued to operate said distilleries on the same extended scale after the act became a law; that part of these products were shipped to the district of Massachusetts, to be sold there and for transportation to other states, and sold by the defendants, through their distributing agents, to dealers in Massachusetts, under a promise on the part of the defendants that if said dealers should purchase their distillery products exclusively from the

distributing agents of the defendants, and should sell the same at prices not lower than the list prices of such distributing agents, and should at the expiration of six months after such purchases certify that they had so exclusively purchased from defendants' agents, and had so sold at the said prices, then defendants would pay to such dealers a rebate of five cents per gallon on all their purchases. The indictment avers that the price at which said products sold was higher than had before that time prevailed, and that by said arrangement defendants controlled and augmented the prices of said products, and by said means exacted and received from the people of the district of Massachusetts a large amount of money over and above that usually received for such products.

These are the substantial facts relied upon to constitute the crime. Of course, it is alleged, with the usual particularity, that all this was done in pursuance of a combination to restrain trade between the states, and to monopolize to the defendants the traffic in the several states in distillery products, and done with the intent and purpose to control the production of said articles and fix the prices at which they should be sold. But it is not sufficient to charge an unlawful intent, or to aver that a combination or a course of business is in restraint of trade, or a monopoly of trade, in order to constitute a crime. Acts relied upon to make the offense must be stated. A combination of act and intent is needed to constitute a crime. No averment of intent alone is sufficient; neither is any amount of act alone; the two must combine.

Assuming an unlawful intent and purpose of a combination to restrain trade and monopolize traffic in these distillery products, as charged in the indictment, do the acts set forth constitute such restraint and monopoly? In what respect did the sales made, as charged, restrain trade or monopolize the traffic in distillery products? These terms, as used in the act of congress under consideration, are well defined at common law, and must be considered with reference to such established meaning. The indictment was prepared with great care by the district attorney of Massachusetts, and it is safe to assume that he has charged therein all the acts which he believed it possible to prove upon the trial. Assuming this to be true, the indictment is significant in what it omits to charge in the respects above referred to. It is not averred that, when defendants purchased their 70 distilleries, they obligated the vendors not to build other distilleries, or not to continue in the distillery business in the future. It is not averred that defendants attempted in any way to bind the vendors to withhold their capital or skill or experience in the business from the public in the future. There is no averment that the defendants in any manner, or at any time, attempted to control the business of the remaining one fourth of the distilleries in the United States, or in any way attempted to limit their output, or by agreement with them control the price at which their products should be sold, or in any degree restrain their trade, or limit the territory over which their trade should extend. The full scope of the averments in this respect is that before this law was passed by congress the defend-

ants legally purchased with their own capital three fourths of the distilleries in the United States, and that they produced 77,000,000 gallons of distillery products, and sold these products in the markets of the several states at the best possible prices; and that they continued so to own and operate said distilleries, and so to sell their products, after the passage of this act. This they did without any attempt at any time, by contract, to control the production of the other distilleries, or the prices at which they should sell, or without any contract with such distillers in any way restraining trade. The indictment, therefore, in my judgment, wholly fails to charge a crime, so far as the purchase of said distilleries or their manufacture of distilled products before the passage of the act is concerned, or so far as they are charged with continuing to own and operate them with unlawful intent after the passage of the act.

Do the acts, in connection with the transportation and sale of said products in the district of Massachusetts as charged, constitute an offense? The substantial facts in this respect, as averred, are that defendants sold their products in Massachusetts, through distributing agents, to dealers there, who were promised a rebate of five cents per gallon on all their purchases, provided said dealers purchased their distillery products exclusively from defendants' agents, and provided they sold the same at prices no lower than the list prices of such agents; and said rebate was to be paid when the dealers should sign a certificate that they had so exclusively purchased from defendants' agents, and had so sold at prices no lower than the list prices of said agents. The indictment in these averments is again significant for its omissions. It fails to charge a contract on the part of the dealer that he would not purchase distillery products from other distilleries, or any contract on his part binding himself to sell at defendants' prices. Such dealers were offered the rebate as an inducement to purchase exclusively from the defendants, and to sell at the prices defendants fixed; but there is no contract averred by which the dealers obligated themselves to do so. In what respects, then, are these acts charged different from the customary efforts of manufacturers or dealers to increase the sale of their products and push their business by the many artifices of trade?

There are no contracts averred, as between the defendants and their customers, which are in restraint of trade. Their acts are rather intended to increase their trade, but not by restraining the liberty of the customer to deal with others, if he wishes to, or can do so, with advantage to himself. If these acts are illegal and in restraint of trade, and if they constitute a monopoly under this act, it may well be denominated an act to restrain legitimate enterprise, and limit and qualify the ownership in property. The acts charged are common and frequent to many branches of manufacture and trade, and if the defendants are guilty in the manner of making sales of their products, as set forth in the indictment, the act is more sweeping in its provisions than ever contemplated by congress, as manifestly appears from the debates in the senate when the act was before it for consideration. From those debates it is evident that the congress did not intend to limit the amount of capital a citizen

should invest in any line of business, or restrain his energy or enterprise in acquiring for himself all the trade possible in such business, provided in doing so he did not, by illegal contracts or devices, restrain others from pursuing the same business, or deprive the public from enjoying the advantages of the free use of capital, skill, and experience of competitors. I am therefore of the opinion that as to the manner in which the defendants made the sales of their products, so far as their acts are set out in the indictment, there is no restraint of trade or monopoly shown, and there is no crime stated or charged. The indictment is therefore insufficient in charging a crime as to either the purchase and use of the distilleries or as to the sale of their products.

It was contended by counsel that, after these products reached the state of Massachusetts, they became property owned and held by the defendants under the laws of that state, and what was done with such products thereafter in that state did not in any way relate to commerce between the states, and therefore the act of congress could not be held to apply to such sales. It was further urged that, if congress intended to say that the acquisition of these distilleries, by purchase or lease, by the defendants, before the act was passed, was a crime, such act was unconstitutional, because *ex post facto* in its character. It was further contended that if congress meant to define as a monopoly—and therefore as a crime —the acquisition by the defendants of the large number of distilleries alleged in the indictment, when such ownership or control was lawful in the states where they were so owned, then congress exceeded its powers, and such act is void. But I have not deemed it necessary to pass upon these questions. I have carefully considered all the acts and unlawful combinations set forth in the indictment in the first, third, and fourth counts, and, for the reasons hereinbefore stated, I am satisfied they are insufficient to make out the crime covered by the first section of the act, viz., a combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several states; and giving to the word "monopoly" its common-law meaning, which is the meaning congress clearly intended, I find the allegations in the second count insufficient to make out the crime covered by the second section of the act, viz., a combination or conspiracy to monopolize any part of the trade or commerce between the states.

In reaching this conclusion, I am relieved to know that if I am in error the government can speedily protect the public from this alleged monopoly by a civil proceeding in any district in the United States in which the defendants transact their business. The act of congress wisely made special provision for just such civil suits, and conferred jurisdiction upon the circuit courts of the United States to enjoin parties from carrying on any monopoly or business in restraint of trade. The district attorneys of the United States, by permission of the attorney general, may institute such proceedings in equity in any district where proper service of process can be obtained upon any of the defendants, and provisions are made for speeding such cases to an early hearing. A suit of this nature was lately instituted in the United States circuit court

at Nashville, Tenn., by the United States through its district attorney, and against an illegal coal monopoly, doing business under a combination clearly differing from this case, and manifestly illegal; and that company was enjoined from doing business, and the public in that suit protected against the high prices in coal which resulted from a contract held illegal under this act. If, therefore, the attorney general of the United States should deem it proper to further test the question of whether the business of the defendants in this case is a monopoly, or in restraint of trade, he may authorize such a civil proceeding to be instituted, and by such suit speedily secure an adjudication from the circuit courts as to the effect and scope of this act. Inasmuch as these defendants were legally engaged in this extended business before the act of congress was passed, it would be fair and proper to proceed against them first by such civil suit. The public would be better protected, and more promptly benefited, by such proceeding, because it could be speedily heard, and relief be effectually granted, by an injunction restraining such business, and destroying the monopoly, if such the court should adjudge it to be. The warrant for removal will therefore be denied, and the defendants discharged from further custody.